**Renee PICHA, by her next friend Christine Picha, Plaintiff,**

**v.**

**Raymond WIELGOS, Principal of Dirksen Junior High School District No. 149, et al., Defendants.**

**No. 74 C 278.**

United States District Court, N. D. Illinois, E. D.

March 4, 1976.

Kenneth Kandaras, Cook County Legal Assistance Foundation, Inc., Patrick A. Keenan, Chicago, Ill., for plaintiff.

Mitchell J. Overgaard, Haffner, Grow, Overgaard & Berghoff, Chicago, Ill., for school defendants.

Thomas R. Bobak, Calumet City, Ill., Howard H. Rosenfeld, Chicago, Ill., for police defendants.

DePaul Law Clinic and Leonard D. Silk, Senior Law Student, Chicago, Ill., of counsel.

## MEMORANDUM OPINION

FLAUM, District Judge:

At the close of evidence in this civil rights case, a motion for a directed verdict by defendant school officials pends before the court. There is also a dispute as to how the jury should be instructed regarding the standard to be applied to searches of junior high school students. While the court is not in a position to make findings of fact under Federal Rule of Civil Procedure 52(a), it must characterize the evidence, and determine the presence of contradictions in the evidence, in order to resolve the matters before it.

It is undisputed in the testimony given at trial that in November, 1973 the defendant school principal, Raymond Wielgos, received a phone call which led him to suspect that the thirteen year old plaintiff and two other girls in his school possessed illegal drugs. The principal was advised by his superintendent to call the police, which he did. When the police arrived each of the girls was separately searched by the school nurse, Margaret Carlson, and the school psychologist, Ruth Golber, in order to establish whether any of the three students possessed drugs. No drugs were found. A conflict in the testimony exists as to what the plaintiff's state of undress was at each particular point of the search, and as to the duration of the search. The plaintiff, Renee Picha, brought this 42 U.S.C. § 1983 suit against the three school officials and the two policemen on the theory that in the course of the incident the defendants violated her civil rights.

■ The basis of the motion for a directed verdict made by the school defendants is that under *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) they are immune from liability. They contend that there has been no evidence of malice, and that the constitutional rights of the plaintiff, vis à vis the school defendants, were either not violated, or were not so settled that mere disregard of them could strip them of immunity. The court finds that there is sufficient evidence, given the nature of the incident, and the testimony of the school officials, for the jury to consider the issue of malice in the *Wood* sense. The court holds that Renee Picha possessed settled, undisputed constitutional rights, which based on the evidence in this case would permit a jury to consider whether these rights had been violated. A delineation of the nature of these rights, and their relation to the *in*

*loco parentis* doctrine that works in favor of Illinois school officials, is necessary to arrive at a proper jury instruction for the prospect of *Wood* immunity.

## THE CONSTITUTIONAL AMBIT OF SCHOOL OFFICIALS WHO ARE DEEMED TO BE *IN LOCO PARENTIS* OF THEIR STUDENTS.

Illinois and many other states have statutes which confer upon school officials the status of *in loco parentis* regarding their students. 122 Ill.Rev. Stats. §§ 24–24, 34–84a. Illinois has held that this status creates certain advantages for school officials regarding the standard of common law tort intent which must be applied in litigation brought against them by students. At least in situations which a school official's role of keeping discipline is at issue, he cannot be liable in tort for mere negligence, but must act in wanton disregard of the safety of his students. *Chilton v. Cook County School District,* 26 Ill.App.3d 459, 325 N.E.2d 666 (1st Dist. 1975); *Clay v. Chicago Board of Education,* 22 Ill.App.3d 437, 318 N.E.2d 153 (1st Dist. 1974); *Kobylanski v. Chicago Board of Education,* 22 Ill.App.3d 551, 317 N.E.2d 174 (1st Dist. 1974). In this respect, Illinois equates the nature of tort liability of teachers *exactly* with the common law tort liability that parents may have toward their children. See *People v. Ball,* 58 Ill.2d 36, 317 N.E.2d 54 (1974) (where teacher committed battery on student for the professed purpose of discipline, the teacher was subject to criminal prosecution if he had inflicted a more severe punishment than the actual parent would have had a right to). Illinois law is unanimous on this score. The only area of ambiguity is exactly what sort of behavior by the teacher is to be deemed related to "discipline" so as to pick up the extra *in loco parentis* latitude in tort usually afforded only to parents. The Illinois Supreme Court has suggested that a school official's role in appraising danger to the student body where information indicated that one of the students had a gun comes under the statutory *in loco parentis* banner. *In Re Boykin,* 39 Ill.2d 617, 237 N.E.2d 460, 462 (1968). It thus appears to be the state law in Illinois that a principal has the same latitude, in tort, to search a student for something believed to be dangerous to the student or the student body, as would the student's actual parent.

One question presented by the motion for a directed verdict is whether the Illinois doctrine can provide a limitation of 42 U.S.C. § 1983 tort liability analogous to what it has done with the common law tort liability of teachers, as expressed by statute. *See Chilton v. Cook County School District, supra.* The issue, however, ultimately is one of the supremacy clause and of the obligation of the states to refrain from enacting laws which smother constitutional rights. The issue was answered before November 1973, the date of the instant occurrence.

The activities of a principal *cum* parent must be considered as the activities of a state official, giving rise to the constraints which flow from the Bill of Rights. A natural parent could oblige his child to salute the flag in the morning at 8:00 A.M., on penalty of loss of breakfast and dinner, without being subject to a civil rights suit. A schoolteacher, however, could not enforce the same commandment without violating the student's First Amendment rights. *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). Similarly, punishment by school officials has been held to be constitutional as long as it was not arbitrary or unreasonable in its severity, *Boykin v. Fairfield Board of Education,* 492 F.2d 697 (5th Cir. 1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1350, 43 L.Ed.2d 438, and corporal punishment while not per se violative of the Constitution, in a school setting, may indeed constitute cruel and unusual punishment prohibited by the Eighth Amendment, *Bramlet v. Wilson,* 495 F.2d 714 (8th Cir. 1974); *cf. Nelson v. Heyne,* 491 F.2d 352 (7th Cir. 1974); *cert. denied,* 417 U.S. 976, 94 S.Ct.

3183, 41 L.Ed.2d 1146 (1975) (medium security boys correctional school), or be subject to a constitutional test of rational relation to a legitimate state end. *Ingraham v. Wright,* 525 F.2d 909 (5th Cir. 1976).

 Most federal cases have not addressed the *loco parentis* question in determining whether interferences with constitutional rights can take place in school settings. One that did indicated that regulations for students' length of hair did not relate automatically to the disciplinary function accorded to the *in loco parentis* authority of the relevant state statute:

> "It is clear that the 'in loco parentis' section of the Pennsylvania School Code (24 P.S. § 13–1317) was never intended to invest the schools with all the authority of parents over their minor children, but only such control as is necessary to prevent infractions of discipline and interference with the educational process." *Axtell v. LaPenna,* 323 F.Supp. 1077, 1080 (W.D.Pa. 1971).

Cases that have not explicitly considered the *in loco parentis* status that may be supplied by statute have made exactly the same analysis, allowing school officials a latitude as against the civil rights of students which takes into account the disciplinary, and educational concerns that inhere in a school setting.[1] For that reason, these cases may be deemed to have already deferred as much to school authority as they would in the event of law comparable to that in Illinois or Pennsylvania. Following that perspective, 42 U.S.C. § 1983 may be deemed in conflict with any broader construction of *in loco parentis* authority, a conflict which state law must lose by virtue of the Supremacy Clause of the Constitution. A state can no more abbreviate its civil rights obligations by creating a variation of the parent-child setting than it can explicitly grant immunity to a public official for misuse of

his office. *Delatte v. Genovese,* 273 F.Supp. 654 (E.D.La.1967) (statute relieved coroner from all liability that arose from his examining persons as required by law).

In deciding whether school officials could prevent the wearing of black armbands for the purpose of protesting the hostilities ongoing in Vietnam, the Supreme Court asked whether the activity could lead those school officials to reasonably forecast a substantial interference with the requirements of discipline. *Tinker v. Des Moines Ind. Sch. Com. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). While the court was particularly sensitive to the important role of the First Amendment in a learning setting where the political and social attitudes of the student body are greatly molded, this sensitivity could only distinguish the standard of interference which would permit a limiting of a constitutionally protected activity; any activity which is constitutionally protected (albeit not by the First Amendment), must meet some comparable standard before it can be inhibited by school officials. Indeed, the procedural due process standard has been given similar treatment. In *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the court found that prolonged suspension of a student required a hearing:

> "The authority possessed by the State to prescribe and enforce standards of conduct in its schools, although concededly very broad, must be exercised consistently with *other* constitutional safeguards." Id. 419 U.S. at p. 574, 95 S.Ct. at p. 736, 42 L.Ed.2d at p. 734 (emphasis added).

Goss appears to have applied the same standard as was used in *Axtell v. LaPenna, supra.*

 On the basis of the foregoing discussion, it is evident that the *in loco parentis* authority of a school official cannot transcend constitutional rights. However, the student-teacher relation-

---

1. See *Breen v. Kahl,* 419 F.2d 1034 (7th Cir. 1969), cert. denied, 398 U.S. 937, 90 S.Ct. 1836, 26 L.Ed.2d 268 (1970).

ship out of which such statutory or common law authority readily flows does have an impact on the application of constitutional doctrine to the rights of students.

■ As its constitutional maximum, an *in loco parentis* statute merely codifies a substantial state interest against which constitutional rights must be balanced. There are no reported cases discovered or suggested by counsel in this case which show a civil rights action for damages arising from a search conducted by a school principal. However, there is a considerable body of case law, mostly state court, discussing what Fourth Amendment protection is required for a student when he or his possessions are searched by a school official. The official may be acting alone, or in conjunction with law enforcement officials.

In *State v. Baccino*, 282 A.2d 869 (Del. Super.1971), a vice principal, deemed *in loco parentis* under state law, wrested a coat away from a truant student who was known to have previously experimented with illegal drugs. The official then searched the coat and found ten packets of hashish, which were ultimately admitted into evidence at the hearing where the student was convicted. The court boldly framed the question before it as whether or not one acting *in loco parentis* should be considered as an arm of the government in assessing the validity of a search and seizure. If the question is answered in the negative (as was done in *Mercer v. State*, 450 S.W.2d 715 (Tex.Civ.App.1970)), there could be no reversal of the conviction, since the exclusionary rule does not apply to evidence seized by a private party. The court nonetheless deemed the principal as a government official for purposes of the issue, and found the proper constitutional standard to be whether the vice principal possessed reasonable suspicion to make the search. It held that he did and affirmed the conviction. Where there was no police involvement, another court held that the school official should be considered a private person, *People v. Stewart*, 63 Misc.2d 601, 313 N.Y.S.2d

253 (1970). Police involvement prior to the search, however, changes the result for every case that has been reviewed. Where the police have significant participation, Fourth Amendment rights cannot leak out the hole of presumed consent to a search by an ordinarily non-governmental party. *Piazzola v. Watkins*, 316 F.Supp. 624 (M.D.Ala.1970), aff'd, 442 F.2d 284 (5th Cir. 1971). The standard in those cases then becomes either probable cause, or else whether the quasi governmental party could reasonably perform the search in the exercise of his official responsibilities. *See Moore v. Student Affairs Committee of Troy State University*, 284 F.Supp. 725 (M.D. Ala.1968). As indicated later in this opinion, the court holds that for the police, the probable cause which ordinarily is required for a valid arrest is necessary to justify the search in the instant case.

■ Since the basis for the motion for a directed verdict is the possible immunity of school officials under *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), it is proper to ascertain whether the school officials had any settled, undisputed obligations under the Constitution to Renee Picha under the circumstances presented at trial. Because this determination is so inextricably intertwined with legal analysis, it is appropriate for the court to make it, rather than the jury.

■ Under *Wood v. Strickland, supra,* school officials are immune from liability for acts which do not violate settled, undisputed constitutional law, as long as the actions are not taken maliciously. There is a dearth of case law construing exactly what "settled undisputed" law means. However, in terms of the policies set forth in *Wood,* it appears that law can be settled without there having been a specific case with identical facts which was decided adversely to the school officials. There is a limitation to the notion that school officials can have one "free" constitutional violation before they are liable for ignoring constitutional rights that arise in each unique factual setting.

1220

At the time of the search of Renee Picha, the Fourth Amendment to the Constitution was in effect. It was clear, in view of the cases earlier discussed, that students in public schools were not relieved of the protection of that amendment except to the extent that a compelling state interest in the maintenance of school activities, particularly discipline, required. It was clear, from the cases *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) that searches motivated by something other than the prospect of obtaining evidence of crime were subject to the general Fourth Amendment standard of reasonableness, and that where the interest in making the search competed with the privacy interest of the individual, the scope of the search had to be appropriately limited, in order to be constitutionally permissible. Thus, a protective search must be confined to an intrusion reasonably designed to discover weapons, and a city's inspection of a residence must not give rise to a greater invasion of privacy than is justified by the public interest the inspection serves. *Terry v. Ohio, supra,* 392 U.S. at p. 31, 88 S.Ct. at p. 1885, 20 L.Ed.2d at pp. 911–912; *Camara v. Municipal Court, supra,* 387 U.S. at pp. 536–537, 87 S.Ct. at pp. 1734–1735, 18 L.Ed.2d at pp. 939–940.

Although not explicitly articulating the parameters of reasonableness in this situation, the Illinois Supreme Court, in *In Re Boykin,* 39 Ill.2d 617, 237 N.E.2d 460 (1968) applied the reasonableness standard to a search conducted by police in the course of an appraisal of danger by the school principal. This court thus concludes that the settled law indicated that as a minimum, Renee Picha could not be subject to an intrusion of her privacy unless that intrusion was reasonably justified in terms of the school's legitimate interests, which are set forth in the statutory codification of *in loco parentis.* Those interests are the ones which the officials are vested with *in loco parentis* authority to carry out,

namely matters relating to discipline, safety, supervision, and activities connection with school programs. 122 Ill.Rev. Stats. § 24–24. This standard is consistent with and required by the one set in *In Re Boykin, supra.* It is also consistent with the thrust of most state and federal decisions that have considered searches carried out jointly by police and school officials. See "Admissibility in Criminal Case Evidence Obtained by Search Conducted By School Official or Teacher." 49 A.L.R.3d 978.

School officials cannot claim immunity when they violate the well settled rights of their students. The court recognizes the novelty of the fact situation, both from a legal standpoint, and from the experimental standpoint of the school officials. However, no case can be found contradicting the notion that when a government official works with the police to conduct a search which is, at least in part, in the nature of a criminal investigation, and which occasions such an invasion of privacy as in the present case, that search is subject to the reasonableness of the Fourth Amendment.

The court now considers the standard, under the facts presented at trial, to which police must adhere to protect the rights of a student under the Fourth Amendment.[2] From the very beginning of this episode, when the principal of the school received information as to the possible presence of drugs, there was police involvement. Indeed, although the school officials continued to act under the color of their statutory school authority, the matter became at least partly a quest for illegal items. As far as the police are concerned, such an investigation cannot come under the ambit of the state interest that dwells under the banner of *"in loco parentis".* Although the school may have an interest in the safety of its charges, either with regard to one student possessing drugs, or with regard to the possibility that that student would transfer possession of drugs to another student, all it can do in furtherance of that interest is

2. The liability of the police of course hinges on whether the jury first finds that the police were a proximate cause of the search.

to locate and perhaps confiscate the drugs. In the course of such a procedure, evidence may be acquired, as was the case in *In Re Boykin, supra,* or as could have been the case in *Potts v. Wright,* 357 F.Supp. 215 (E.D.Pa.1973), which may ultimately be considered to have been reasonably obtained and therefore usable in a criminal prosecution or in an adjudication of delinquency. However, the evidence here could not support a jury finding that the police were called merely in furtherance of this interest.[3] Consequently, the substantial state interest in the provision of education and the maintenance of school discipline cannot be here said to temper the application of the Constitution to a search caused by police for evidence of crime. Moreover, whatever may be the consent to the discretion of the school officials deemed constructively made by parent or student, it cannot vitiate the constitutional expectation of privacy which creates the need for levels of suspicion and/or exigency in the conduct of a criminal investigation. *Smyth v. Lubbers,* 398 F.Supp. 777 (W.D.Mich.1975); *Piazzola v. Watkins,* 316 F.Supp. 624 (M.D.Ala.1970), *aff'd,* 442 F.2d 284 (5th Cir. 1971).

The nature of the intrusion occasioned by a search, in this case, is such that it can only be accomplished by a detention of the person. It is not a mere pat-down, as in *Terry v. Ohio, supra,* but requires as total, if brief, a seizure of the person as possible. Given the responsibility of the police to find evidence of crime, in this case, the standard of probable cause for an actual arrest must be met to justify the search under the Fourth Amendment.[4] Therefore, the jury must be instructed that a civil rights violation may occur if the police proximately caused Renee Picha to be searched without their having probable cause to believe she was then breaking the law by possessing an illegal substance on her person.

CONCLUSION

The law was settled, that when Renee Picha was searched, that she had a constitutional right not to be searched by school officials who were in contact with the police unless the extent of the intrusion occasioned by the search was justified in terms of the state interest of maintaining the order, discipline, safety, supervision, and education of the students within the school. This court further holds that in the circumstances of this case, Renee Picha had a constitutional right not to have the police cause a search in the absence of probable cause that she possessed an illegal material at the time of the search.

Under *Wood v. Strickland, supra,* public officials have no immunity from civil rights liability when they disregard settled constitutional rights, regardless of the knowledge or intention those public officials have with regard to those rights. Immunity is also absent if the public officials proximately caused a violation of constitutional rights, settled or unsettled, and did so with malicious intention to cause a constitutional deprivation or other injury to a student.

For the foregoing reasons, the school officials' motion for a directed verdict must be denied. The instructions to the jury shall reflect the holdings of this opinion.

---

3. The court need not decide what standard would be appropriate if they were.

4. Probable cause exists where "the facts and circumstances within their (the arresting officers) knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that [an offense has been or is] being [committed]." *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543, 555. *Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327, 332 (1959) (footnote omitted).