Judge ERDMANN
delivered the opinion of the Court.
First Lieutenant Patrick L. Simmons was tried by a general court-martial composed of officer members and was convicted of assault consummated by a battery and conduct unbecoming an officer and gentleman in violation of Articles 128 and 133, Uniform Code of Military Justice [UCMJ], 10 U.S.C. §§ 928 and 933 (2000), respectively. The adjudged and approved sentence included dismissal, confinement for nine months, and total forfeiture of all pay and allowances.
Prior to trial, Simmons.filed a motion to suppress a handwritten letter discussing a homosexual relationship and a portion of a videotaped interrogation conducted by civilian law enforcement officials concerning the letter. Simmons argued that the letter had been discovered and seized in violation of his Fourth Amendment rights and that the challenged portions of the videotaped statement were derivative of the illegally seized letter. The military judge denied the motion to suppress and both the letter and the videotaped statement were admitted into evidence.
The Army Court of Criminal Appeals held that the search leading to the discovery of the letter violated the Fourth Amendment and that the military judge had erred in allowing the admission of the letter and the derivative videotaped statement into evidence. It determined, however, that the military judge’s error was “harmless beyond any reasonable doubt.” United States v. Simmons, ARMY 20000153, slip op. at 9 (A.Ct.Crim.App. March 31, 2003). We granted review of the following issue:
WHETHER THE ARMY COURT OF CRIMINAL APPEALS ERRED WHEN IT FOUND THAT APPELLANT’S 4TH AMENDMENT RIGHTS WERE VIOLATED BUT THEN CONCLUDED THAT THE ERROR WAS HARMLESS BEYOND A REASONABLE DOUBT.
We hold that the Court of Criminal Appeals correctly assessed the effect of the improperly admitted evidence with respect to a portion of Simmons’ finding of guilt under Article 133, but erred in concluding that the effect of the improperly admitted evidence on the Article 128 assault conviction was harmless beyond a reasonable doubt.

BACKGROUND

Both convictions flow from Simmons’ relationship with an enlisted subordinate in his unit, Private First Class (PFC) W. At some point in early August 1999, Simmons and PFC W entered into an arrangement under which PFC W occupied, at times, one of the two bedrooms in the off-post apartment *487 leased by Simmons in Killeen, Texas. Although PFC W was not a party to the apartment lease, he kept several sets of clothing there and spent approximately 15 nights at the apartment during August 1999.
On August 29 Simmons and PFC W had an argument. PFC W subsequently left the apartment but returned later in the afternoon with another soldier to pick up some personal items. Upon his return, PFC W and Simmons engaged in an escalating confrontation that eventually turned physical.
At that point, the soldier who had accompanied PFC W to the apartment contacted the police. Officer Fox of the Killeen Police Department arrived on the scene and asked Simmons what had happened. Simmons advised Officer Fox that there had been a fight but that PFC W had already left the apartment. After the other soldier advised Officer Fox that PFC W had not in fact left the apartment, Simmons consented to Officer Fox’s entry into the apartment where he discovered PFC W lying unresponsive on the floor in a pool of blood.
Simmons told Officer Fox that PFC W had barged in and that he [Simmons] “had to kick his ass.” Due to the amount of blood and the nature of PFC W’s injuries, Officer Fox believed that a weapon had been used and he ordered Simmons to the floor and frisked him for weapons, but found none. After interviewing several witnesses, Officer Fox arrested Simmons for assaulting PFC W and Simmons was transported to the Killeen Police Department for questioning.
Officer Fox conducted two brief searches of the apartment looking for a weapon, but no weapon was found and no evidence was seized as a result of those searches. After Officer Fox had concluded his second search and 20 minutes after Simmons had been removed from the scene, Investigator Boone of the Killeen Police Department arrived and Officer Fox advised him that he had already searched for a weapon. Investigator Boone spent the next hour to hour and a half taking photographs, examining clothing and conducting his own search of the apartment. After observing a bloodstain on the sink and counter in' the guest bathroom, Investigator Boone entered the bathroom and opened a closed medicine cabinet.
Upon opening the cabinet door, Investigator Boone observed a manila file folder with handwritten text on the outside of the folder. Without removing the folder, Investigator Boone read the text. According to Investigator Boone, the text discussed a homosexual relationship and, based on his assessment that the handwriting appeared similar to other visible items in the apartment bearing Simmons’ name, Boone seized the letter as evidence of possible motive for the assault. Officer Fox testified that Investigator Boone’s comment to him upon finding the letter was something to the effect of “This is going to be good.”
The next morning Investigator Boone interrogated Simmons for over an hour concerning the circumstances surrounding the fight with PFC W and videotaped that interrogation. Simmons initially denied anything more than a platonic relationship with PFC W, but when Investigator Boone informed him that he had seized the handwritten letter, Simmons admitted to a sexual relationship with PFC W. This admission occurred during the last three minutes of the interrogation.
Simmons sought to suppress both the handwritten letter and his videotaped statement on the grounds that the search by which the letter had been discovered and its subsequent seizure had occurred in violation of his Fourth Amendment rights. The military judge denied that motion and Simmons ultimately testified in his own defense at trial concerning his relationship with PFC W, including the circumstances surrounding the seized letter and the homosexual nature of their relationship. Simmons indicated that PFC W had at first blackmailed him regarding his homosexuality, but that they subsequently became friends and that the relationship became sexual. He further testified to having taken PFC W to his family reunion and to having lent him money that PFC W had failed to repay.
With respect to the assault charge, Simmons raised the defense of self-defense. He testified that PFC W continuously came at *488 him and that he struck back simply to keep him away. Simmons also testified that PFC W had injured him on prior occasions by punching him, pushing him into a bathtub and cracking a rib, kicking him in the stomach, biting his finger, hitting him in the face, grabbing his testicles and stabbing him in the back with a knife. Simmons stated that due to these prior beatings, at the time of the fight with PFC W, he was in fear for his life.
The soldier who had accompanied PFC W to the apartment was the only other witness to the fight. He testified that he never saw Simmons strike PFC W and that the only physical act he observed was PFC W having Simmons pinned against a glass window with his forearm against Simmons’ throat. The soldier separated the two because of his concern that Simmons could have gone through the window and been severely cut by the glass. According to the soldier, he complied with Simmons’ request to leave the apartment at that point and then asked a neighbor to call 911.
PFC W testified under a grant of immunity and, although he denied any homosexual relationship with Simmons, he acknowledged that Simmons had confided his homosexuality to him. He testified that Simmons had taken him to a homosexual club on two separate occasions, had attempted to kiss him twice and had grabbed his buttocks on a few occasions.
In regard to the assault charge, PFC W testified that he had returned to the apartment to retrieve his clothing and effects. He testified, however, that he had no specific recollection of the assault apart from being grabbed from behind, exchanging words with Simmons concerning telephone calls made to PFC W’s girlfriend and hitting the ground with blood coming out of his nose and mouth. The injuries PFC W sustained as a result of the assault included a fracture of the bones right below the right eye, a fracture through the thin part of the skull just above and in front of the right ear, and a small amount of bleeding just over the surface of the brain.
The members found Simmons not guilty of the charged assault in which grievous bodily injury is inflicted, but guilty of the lesser-included offense of assault consummated by battery. The members also found him guilty of conduct unbecoming an officer and a gentleman, with the language of the guilty finding modified through exceptions and substitutions as follows:
[0]n or between 01 September 1998 and 29 August 1999, at or near Camp Dobol, Bosnia and Fort Hood, Texas, wrongfully enter into an unprofessional relationship with [PFC W], a subordinate, to wit: a close personal friendship, a rent-paying roommate regular over-night [sic] guest relationship, an intimate relationship involving sexual contact, and the pursuit of a continued romantic relationship by means of writing and delivering to [PFC W] a letter in which the said 1LT Simmons solicited a continued romantic relationship, in violation of the customs of the United States Army that officers shall not fraternize with enlisted persons on terms of military equality.

DISCUSSION

A. Introduction
The Government has not certified any challenge to the Court of Criminal Appeals’ determination that the evidence at issue here was the product of a search and seizure that violated Simmons’ rights under the Fourth Amendment. See Article 67(a)(2), UCMJ, 10 U.S.C. § 867(a)(2) (2000). Although we are not precluded from examining the legal ruling of a service court in a case where the Judge Advocate General has not certified the issue for review, we are reluctant to exercise that power and, as a rule, reserve it only for those cases where the lower court’s decision is “clearly erroneous and would work a manifest injustice” if the parties were bound by it. United States v. Doss, 57 M.J. 182, 185 (C.A.A.F.2002)(citing Christianson v. Colt Industries Operating Corp., 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988)). That is not the case here.
We therefore turn to the question presented by the granted issue, which is whether the Army Court of Criminal Appeals properly assessed the impact of the military judge’s *489 erroneous denial of Simmons’ motion to suppress certain evidence.
B. Standard of Review
The Court of Criminal Appeals properly identified the applicable legal standard. After finding that the military judge erroneously admitted into evidence material that the Government had obtained in violation of Simmons’ rights under the Fourth Amendment, that error was subject to a “harmless error” review under Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Under Chapman, a reviewing court must declare the impact of the error to be “harmless beyond a reasonable doubt” in order to affirm the resultant conviction. See e.g., United States v. Hall, 58 M.J. 90, 94 (C.A.A.F.2003).
The Government bears the burden of establishing that any constitutional error is harmless beyond a reasonable doubt. Id. (citing Chapman, 386 U.S. at 24, 87 S.Ct. 824). Whether the error is harmless beyond a reasonable doubt is a question of law that we review de novo. Id. (citing Arizona v. Fulminante, 499 U.S. 279, 295-96, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)).
The question before this Court, therefore, is whether the effect of the improperly admitted evidence on Simmons’ convictions was harmless beyond a reasonable doubt. The inquiry under the Chapman analysis is whether “it appears ‘beyond a reasonable doubt that the error complained of did not contribute to the verdict[s] obtained.’ ” Mitchell v. Esparza, — U.S. -, 124 S.Ct. 7, 11, 157 L.Ed.2d 263 (2003)(per curiam) (quoting Neder v. United States, 527 U.S. 1, 15, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)). See also Hall, 58 M.J. at 94.
C. The Article 133 Conviction
The finding of guilt in regard to the Article 133 conviction reflects a determination by the members that Simmons engaged in the following with PFC W:
• a close personal friendship;
• a regular overnight guest relationship;
• an intimate relationship involving sexual contact; and
• the pursuit of a continued romantic relationship by means of writing and delivering to PFC W a letter in which Appellant solicited a continued romantic relationship.
In regard to the “pursuit of a continued romantic relationship” portion of the finding, in order for us to deem the erroneous admission of the illegally seized letter “harmless beyond a reasonable doubt,” we would have to conclude that it “did not contribute to” a guilty finding that makes specific reference to the letter itself. Neder, 527 U.S. at 15, 119 S.Ct. 1827. That we cannot do. The very act of “writing and delivering” that letter was an explicit part of the criminal conduct that Simmons was charged with and found guilty of. Absent the erroneous admission of the letter into evidence, the members could not have found him guilty of “writing and delivering” it.
We also cannot conclude, beyond a reasonable doubt, that the admission of the letter and the derivative videotaped statement by Simmons concerning the sexual nature of his relationship with PFC W “did not contribute to” that portion of the guilty finding regarding “an intimate relationship involving sexual contact.” The letter indicates that “sex w/ [PFC W] was incredible” and that Simmons knows he will never have sex with PFC W “until [PFC W] is ready again or never.” The videotaped statement contains Simmons’ acknowledgement that he and PFC W had sexual relations.
As the Court of Criminal Appeals noted, however, PFC W denied having any sexual relationship with Simmons. Thus, the only evidence in that regal’d apart from the improperly admitted letter and derivative videotaped statement was Simmons’ trial testimony. Although there was testimony from other witnesses concerning the friendship between Simmons and PFC W in Bosnia and at Fort Hood, none of that testimony was directed toward establishing a sexual relationship.
Under the circumstances of this case, we are not convinced that the defense strategy of *490 having Simmons testify at trial concerning the sexual nature of the relationship would have been the same in the absence of the improperly admitted evidence. See e.g., United States v. Grooters, 39 M.J. 269, 273 (C.A.A.F.1994) (accused may not have been compelled to testify to explain improperly admitted statements); United States v. Bearchild, 17 C.M.A. 598, 602, 38 C.M.R. 396, 400 (1968)(in-court testimony tainted if given to overcome inadmissible confession). Although we need not determine whether their improper admission was the exclusive motivation, Simmons’ trial testimony on this aspect of the charged offense was clearly responsive to the letter and derivative videotaped statement. In the absence of those items of evidence (which should not have been admitted) or supporting testimony from PFC W (which did not exist), the record does not reflect any other evidence available to demonstrate the existence of “an intimate relationship involving sexual contact.” Under those circumstances, we cannot view Simmons’ trial testimony as an “independent” basis for concluding that the improperly admitted evidence “did not contribute to” that portion of the finding regarding sexual contact.
We can conclude, however, that the admission of the improper evidence did not contribute to the remaining portions of the finding, that Simmons engaged in “a close personal friendship” and “regular over-night [sic] guest” relationship with PFC W. As noted by the Court of Criminal Appeals, there was testimony and evidence unrelated to the improperly admitted letter and derivative statement that demonstrated the unprofessional character of Simmons’ relationship with PFC W:
In addition to PFC W’s testimony, a staff sergeant in appellant’s platoon testified that the noncommissioned officers expressed concerns about appellant’s relationship with PFC W; that he saw PFC W driving appellant’s car; and that personnel commented that if someone wanted to find appellant when in the field, he or she would likely find him at PFC W’s medic track. Appellant’s platoon sergeant also testified that appellant spent a lot of time at the medic track; that PFC W and appellant called each other by their first names; that appellant pulled PFC W off of guard duty when they were deployed to Bosnia. A neighbor in the apartment complex testified that PFC W lived in appellant’s apartment. Private First Class W’s fiancée testified that PFC W lived with “Patrick,” the appellant. A written statement given by appellant to [Investigator] Boone, in which appellant accounts for the events on the day the assault occurred, was admitted into evidence without objection. Appellant referred to PFC W by his first name throughout the statement; stated that PFC W had stayed overnight in his apartment the prior evening; mentioned that he cancelled a visit that he and PFC W had planned to appellant’s sister-in-law; and drank beer together while watching football games.
Simmons, slip op. at 7-8. The quantum and character of the evidence specifically referred to by the Court of Criminal Appeals above is not related to or otherwise a product of the illegally seized letter or the derivative videotaped statement. Moreover, Simmons did not seriously contest the friendship and roommate aspects of the charge. In light of those circumstances, we conclude beyond a reasonable doubt that the constitutional error did not contribute to that portion of the guilty finding that refers to “engaging in a close personal friendship” and a “regular over-night [sic] guest” relationship with PFC W. See Neder, 527 U.S. at 15, 119 S.Ct. 1827.
Accordingly, while we conclude that the military judge’s error was not harmless beyond a reasonable doubt with respect to the members’ guilty finding of conduct unbecoming an officer and a gentleman in regard to the sexual contact and the improperly admitted letter, we conclude that the military judge’s error was harmless beyond a reasonable doubt with respect to that portion of the members’ guilty finding that Simmons violated Article 133 by engaging in “a close personal friendship” and “regular over-night [sic] guest” relationship with PFC W.
*491 D. The Article 128 Conviction
The Court of Criminal Appeals focused exclusively on Simmons’ conviction under Article 133 and did not assess the impact of the erroneously admitted evidence on Simmons’ conviction for assault consummated by a battery. While they are distinct criminal offenses our inquiry remains the same — can the Government demonstrate beyond a reasonable doubt that the admission of the illegally seized letter and the derivative videotaped statement did not contribute to the finding of guilt under the assault charge? See Neder, 527 U.S. at 15, 119 S.Ct. 1827.
The Government has not met its burden here. Under the Government’s theory of the case, the assault was the direct product of Simmons’ alleged unrequited homosexual “obsession” with PFC W. In fact, trial counsel referred to the illegally seized letter in the beginning, middle and end of his closing argument. The illegally seized letter and derivative videotaped statement were the obvious centerpieces of the Government’s theory and, as discussed above, were the only evidence apart from Simmons’ derivative trial testimony that concerned a homosexual relationship. Simmons, on the other hand, vigorously contested that theory of the assault and raised evidence under a self-defense theory. PFC W testified to only a limited recollection of the events surrounding the fight. The only other witness testified that he saw PFC W pinning Simmons to a window with his arm to his throat.
Under those circumstances, the Government has not met its burden of demonstrating that the error was harmless beyond a reasonable doubt under the Chapman analysis. We cannot say that the improper admission of the evidence at issue here and the “gay obsession” theory that it was offered in support of did not contribute to the finding of guilty under the assault charge. See Neder, 527 U.S. at 15, 119 S.Ct. 1827.

CONCLUSION

The decision of the United States Army Court of Criminal Appeals is reversed. The finding of guilty of Charge II, its specification and the sentence are set aside. That portion of the specification under Charge I referring to “an intimate relationship involving sexual contact” and “the pursuit of a continued romantic relationship by means of writing and delivering to [PFC W] a letter in which the said 1LT Simmons solicited a continued romantic relationship” is set aside, but Charge I and the balance of its specification is affirmed. The case is returned to the Judge Advocate General of the Army. A rehearing on Charge II and the sentence may be ordered. If a rehearing as to Charge II is deemed impracticable, the dismissal of Charge II and a rehearing as to sentence alone may be ordered.